G

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| **GREGG BRAUN, Chapter 11 Trustee for COAST GRAIN COMPANY, a California corporation,** | ) ) ) | **CV-F-02-6482 AWI SMS** |
| | ) | **MEMORANDUM OPINION** |
| **Plaintiff**, | ) ) | **AND ORDER ON DEFENDANT'S MOTION FOR** |
| **v.** | ) ) | **PARTIAL SUMMARY JUDGMENT** |
| **AGRI-SYSTEMS, a Montana corporation,** | ) ) ) | |
| **Defendant** | ) ) | **Doc. # 266** |
| | ) ) | |
| **AND RELATED COUNTERCLAIMS** | ) ) | |

This is an action by Greg Braun ("Plaintiff"), trustee for the bankruptcy estate of Coast Grain Company, a California Corporation ("Coast") against Agri-Systems, a Montana Corporation ("Defendant" or "Agri-Systems") for alleged losses related to a construction project in Madera, California.  The complaint by Plaintiff against Defendant alleges claims for relief for breach of construction contracts, breach of express warranty, breach of implied warranty, negligence, breach of confidentiality agreement, and declaratory relief.  In the instant motion for partial summary judgment, Defendant seeks partial summary judgment to prevent any award of purely economic damages for alleged construction defects or project delay.  Diversity jurisdiction exists pursuant to 28U.S.C., section 1332.  Venue is proper in this court.

## GENERAL FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On March 1, 2000, Coast entered into a construction contract (the "2000 Contract") with Defendant for the construction of a "steam flaking facility and agricultural processing plant" (the "Project") in Madera, California. On August 1, 2001, more than one year before institution of proceedings in this court, Defendant filed a complaint in Madera County Superior Court (the "state action") for breach of contract and three other causes of action relating to Coast's alleged failure to pay $1,030,000 in outstanding invoices. On October 14, 2001, the parties entered into a second construction contract (the "2001 Contract") for labor, tools and equipment necessary to complete certain portions of the Project that had not been completed under the 2000 Contract. On October 15, 2001, an involuntary Chapter 11 bankruptcy petition was filed against Coast. Plaintiff was appointed trustee of the bankruptcy estate.

On November 27, 2002, Plaintiff, with permission of the bankruptcy court, filed the complaint in this case alleging breach of contract, breaches of express and implied warranties, negligence, breach of confidentiality agreement and requesting declaratory relief. On July 9, 2003, this Court denied Defendant's motion to dismiss Plaintiff's Complaint. On August 12, 2003, Defendant filed a Counterclaim. The counterclaim has been amended twice. The currently operative pleading is the Second Amended Counterclaim filed March 4, 2005 ("SACC"). The SACC consolidated a state court action which sought foreclosure of Defendant's mechanics lien filed August 24, 2001, against the Project. Defendant's SACC alleges claims for relief on three theories to recover $1,030,000.00 that Defendant claim is owing from the 2000 Contract. On July 2, 2005, Plaintiff filed a motion for partial summary judgment on Defendant's mechanics lien on the Project. That motion was denied by this court's order of December 8, 2005.

The instant motion for partial summary judgment was filed by Defendant on March 3,

2

1  2006.  Plaintiff filed his opposition on March 17, 2006.  Defendant filed its reply brief on

2  March 26, 2006.  On March 29, 2006, the court issued an order vacating the hearing date of

3  April 3, 2006, and taking the matter under submission as of that date.  On March 29, 2006

4  Plaintiff filed objections to certain transcripts and exhibits submitted by Defendant as

5  untimely filed or lodged.

6  **UNDISPUTED MATERIAL FACTS**

7  Plaintiff has responded to Defendant's statement of undisputed material facts and has

8  objected generally to all facts submitted primarily on grounds of lack of foundation and

9  hearsay.  Plaintiff's objections on foundational or other non-factual grounds are noted and

10  overruled unless otherwise specified.

11  The court has reviewed the parties' statements of undisputed and disputed material

12  facts.  To a significant extent, the issues presented by the instant motion for partial summary

13  adjudication are resolved as a matter of law and consequently their resolution is largely

14  independent of the particular facts of the case.  The court will not include in the statement of

15  undisputed material facts those facts that are not essential to the resolution of the issues

16  currently before the court.  To the extent alleged undisputed material facts are disputed and to

17  the extent such disputations are relevant to the issues presented here, the disputations will be

18  noted.

19  *A.  Facts Pertaining to Provisions of the 2000 Contract*

20  The parties generally agree as to the provisions of the 2000 contract.  The 2000

21  contracted was executed on or about March 13, 2000 for the design and construction of a

22  dairy feed mill near Madera, in Madera County California.  Under the terms of the 2000

23  Contract, Agri-Systems was to be paid a fixed price of $8,543,000.00, subject to increases in

24  accordance with change orders, additional work performed at the owners' request, and

25  amounts paid by Agri-Systems for which Coast was responsible for reimbursement.  The time

26  period for "mechanical completion" as defined in Subsections 19.2 and 19.3 of the 2000

27

28  3

Contract, was 365 days, subject to extension for reasons stated in Section 19.6 of the contract, from the later of (i) Agri-Systems' receipt of Coast's written notice to proceed or (ii) Agri-Systems' receipt of satisfactory building permits.  The 2000 Contract provided that excusable delays in mechanical and/or substantial completion of the Work included, without limitation, delays caused by or attributable to modifications or changes to the Work requested or required by the owner; acts, demands or requirements of any governmental authority; fire; inclement weather; and "shortages of fuel, power, materials, machinery or equipment."

Defendant alleges the Project was overseen from March 2000 until January 2002 by a Mr. David Vandiver, whom Defendant alleges possessed "substantial experience in construction project management for several firms."  The thrust of Defendant's allegation of Vandiver's oversight is that Vandiver was on the Project site continuously, conducted frequent inspections and was qualified to conduct construction inspections.  Plaintiff vigorously disputes Defendant's characterization of Vandiver as being a person qualified to carry out ongoing inspections of the project.  As discussed more fully below, facts pertaining to the latency or patency of construction defects or to the qualifications of Vandiver to detect the alleged defects or to certify their absence is not material to the issues presented by the instant motion.  The court therefore makes no determination as to these issues.

Defendant also alleges undisputed material facts pertaining to Coast's retention of Twining Laboratories to carry out inspections of the project and the scope and frequency of those inspections.  These proffered facts are also pertinent to the question of the patency or latency of the alleged construction defects and to the qualifications of Twining Laboratories to certify the absence of such defects.  Defendant also contends that Twining Laboratories was retained to inspect the steel rebar prior to concrete being poured and that both Twining and Vandiver had adequate opportunity to inspect the rebar before the concrete was poured. Defendant alleges, and plaintiff disputes, that Defendant was never notified by Vandiver, Twining Laboratories or by any other inspecting agency that there were any defects in the

4

steel rebar, or any other aspect of the construction of the Project under the 2000 Contract.  As above, the proffered facts, and the related disputations by Plaintiff, are not material to the court's determination of the issues before it as a result of Defendant's motion for partial summary adjudication.

Before August 24, 2001, Coast was in default in payment of Agri-Systems' invoices that had been approved by Vandiver.  In August, 2001, Agri-Systems gave notice of its intent to cease work on the Madera Project unless its approved past due invoices were paid by Coast.  Agri-Systems filed a mechanic's lien for $1,030,000 against  the Madera project on August 24, 2001, and filed suit to foreclose the lien and for other relief on August 28, 2001.

### B.  Facts Pertaining to the 2001 Contract

On August 24, 2001, Agri-Systems' Bob Hamlin and Coast's David Vandiver signed an acknowledgment indefinitely extending the completion date under the 2000 Contract.  On October 14, 2001, after a meeting at the Madera Project site among Coast Grain Project Manager David Vandiver and officers Steve Boren, Tom O'Brien, and John Stellingwerf, with Agri-Systems' officers Bob and Matt Hamlin, Agri-Systems and Coast executed a document prepared at the site entitled "Construction Agreement" (hereinafter "the [2001] Contract" or "the Second Contract").  Under the 10/14/01 Contract, Agri-Systems agreed to perform the work and supply the materials needed to obtain a Madera County occupancy permit and permission to operate the Project.

The 2001 Contract expressly provided that the 2000 Contract had been canceled and was no longer in force or effect, except that "any unpaid amounts are still due and payable with interest accruing on unpaid balances at 12% per annum until paid."  The 10/14/01 Contract provided for completion within 65 "normal working days" (defined as 5 days per week excluding holidays) of Agri-Systems' receipt from Coast of the $500,000 downpayment, Note and Deed of Trust; subject to extensions or delays as described in subsection 18.3 of the agreement.  The 10/14/01 Contract provided that, subject to excusable

delays as provided, Agri-Systems would compensate Coast at the rate of $250.00 per day, commencing 15 days after the completion date, for delay in completion. As of August 24, 2001, the Madera Project was not completed or in condition that either Coast or a buyer could receive a certificate of occupancy.

On November 28, 2001, Coast requested voluntary Chapter 11 protection as a debtor in possession and an order for relief was entered by Coast's Bankruptcy Court. On about December 14, 2001, Coast filed in its bankruptcy its Schedules of Assets and Liabilities and Statement of Financial Affairs. Defendant alleges Coast listed Agri-Systems as a secured creditor holding a claim of $1,030,000.00 secured by a mechanic's lien on the Madera Property, and another claim of $2,000,000, secured by a deed of trust on the property. On March 13, 2002, Plaintiff Greg Braun was appointed Trustee of the Coast Grain Chapter 11 Estate. Plaintiff alleges that as of his appointment as trustee and since then Plaintiff has disavowed the listing of Agri-Systems' secured claims as undisputed and has filed claims against Agri-Systems. Plaintiff alleges all claims by Agri-Systems are disputed at this point.

About May 1, 2002, Braun, as Trustee, retained McCarthy & Co., investment brokers, of Omaha, Nebraska to advertise for sale and solicit offers for the purchase of Coast's properties, including the Madera property. On May 6, 2002, Agri-Systems notified Scott England that Agri-Systems had completed its work under the 10/14/01 Contract for issuance of a certificate of occupancy. On May 7, 2002, England responded via email to Agri-Systems' May 6, 2002 letter, acknowledging the October 2001 Contract and advising Agri-Systems would be charged for delay damages from February 15 to May 1, 2002 in accordance with the Contract. The parties vigorously dispute whether Defendant completed the work under the 2001 contract, whether the work was completed satisfactorily, and whether Defendant continued to work on the Project to complete the punch list and assist in start-up. Plaintiff contends Defendant failed to complete the project by the February 4, 2002 deadline imposed by the 2001 Contract, or at all. These facts, while no doubt important to the overall

case, are not relevant to the issues presented by the instant motion.

### C. Facts Pertaining to the Sale to Pacific Ethanol

McCarthy's listing of the Madera property described its components; rail unloading, grain storage and production capacities, making no reference whatsoever to any alleged construction defects or deficiencies in the facility.  On June 17, 2002, the Coast Bankruptcy Court entered its Order Granting Motion for Approval of Bidding Procedures, approving Braun's motion for authority to auction the Madera property.  Defendant alleges that Braun as Coast Trustee commenced "start-up" of the Madera mill facilities in about August, 2002; and demonstrated for potential buyers before the Project was sold that it would operate at its design capacities.  Plaintiff disputes this claim in that testimony by the then project supervisor, Mr. England, established that the Project never operated at its full design capacity.

In August, 2002, the Coast Madera property and improvements were appraised by Charles Blodgett, an appraiser with more than 25 years' experience and training, for $5,000,000.  Blodgett attributed his conclusion that the property was worth much less than Coast's investment in it due to the specialized nature of the improvements, the fact that dairy feed mills were overbuilt by 30 to 40% in the Madera area, the fact that environmental concerns had caused lesser dairy expansion into the Madera area than previously projected, and the fact that Coast was in bankruptcy liquidation.

On about March 28, 2003, Braun executed a purchase and sale agreement with Pacific Ethanol, Inc., conditioned upon bankruptcy court approval, to sell the Madera property for $5.1 million, free and clear of liens and encumbrances; as is, without warranties; subject to the right of the proposed purchaser to conduct any and all tests and inspections desired during an approximately 30 day due diligence period.  In the 3/28/03 Agreement, Braun (as Seller) agreed to provide to Pacific Ethanol any and all reports or analyses in the Seller's possession regarding the condition of the Madera property. The Agreement further provided that:

7

"If, as a result of Buyer's inspections of physical characteristics and review of Seller's Documents, Buyer identifies a construction defect, a failure to complete a significant aspect of the improvements or structures on the Property or any other material physical condition that makes the Property unsuitable for Buyer's intended use as a feedmill, a rail unloading facility and/or an ethanol plant, then Buyer, in its sole and absolute discretion, may either (i) take title to the Property, subject to such physical condition, or (ii) terminate this Agreement by . . . notice . . . on or before Buyer's inspection completion date."

Regarding the condition of the Madera property, Braun, Trustee, as Seller, warranted that: "Condition of Property. There are no natural or artificial conditions upon the Property or any part of the Property that could result in a material and adverse change in the condition of the Property." The parties dispute whether, as Defendant alleges, the Madera Project was examined by a structural engineer who advised Scott England and Coast Trustee Braun that the facility was structurally sound. Greg Braun advised McCarthy & Co. on May 8, 2003 that he did not have any structural reports regarding the Madera Project.

On April 3, 2003, Braun filed a motion for approval of the proposed sale to Pacific Ethanol, free and clear of liens under Bankruptcy Code §363, subject to potential upset bid. In Declarations filed April 3, 2003 in support of the Motion to Sell Free and Clear of Liens, Braun as Trustee and Mark Lakers of McCarthy & Co. advised the Court that the Pacific Ethanol purchase offer was in the best interest of the Coast Estate because, although higher offers for purchase of the Madera property had been received, the terms and conditions of such other offers were not in their opinions as favorable to the Estate. Nowhere in such Declarations did Braun or Lakers state or imply that the proposed Pacific Ethanol purchase price of $5.1 million was diminished, depressed or in any way influenced by alleged construction defects or structural deficiencies in the Madera Project facilities. The sale of the Madera property to Pacific Ethanol for $5,100,000 closed escrow on about June 20, 2003.

The parties dispute whether the selling price to Pacific Ethanol was diminished by the alleged construction defects. The parties do not dispute that Braun as Trustee, and the Coast Estate, spent *at most* approximately $500,000 between May 1, 2002 and closing of sale to Pacific Ethanol in June, 2003 for alleged "punchlist items" and to make the Madera facility

8

operational prior to closing the sale to Pacific Ethanol.

The court notes a number of alleged undisputed material facts have been omitted because they are not relevant to the discussion that follows or to the resolution of the issues presented by the instant motion.  The court makes no determination as to whether the omitted facts are established or whether they are relevant to issues not considered here.

## LEGAL STANDARD

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Poller v. Columbia Broadcast System, 368 U.S. 464, 467 (1962); Jung v. FMC Corp., 755 F.2d 708, 710 (9th Cir. 1985); Loehr v. Ventura County Community College Dist., 743 F.2d 1310, 1313 (9th Cir. 1984).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party has the burden of proof at trial, that party must carry its initial burden at summary judgment by presenting evidence affirmatively showing, for all essential elements of its case, that no reasonable jury could find for the non-moving party.  United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir.1991) (en banc); Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986); see also E.E.O.C. v. Union Independiente De La Autoridad De Acueductos Y Alcantarillados De Puerto Rico, 279 F.3d 49, 55 (1st Cir. 2002) (stating that if "party moving for summary judgment bears the burden of proof on an issue, he cannot prevail unless the evidence that he provides on that issue is conclusive.")

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Anderson, 477 U.S. 248-49; Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  First Nat'l Bank, 391 U.S. at 290; T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments); International Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56(c); Poller, 368 U.S. at 468; SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982).  The evidence of the opposing party is to be believed, Anderson, 477 U.S. at

255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)(per curiam); Abramson v. University of Hawaii, 594 F.2d 202, 208 (9th Cir. 1979).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

## DISCUSSION

In the complaint, Plaintiff alleges damages from a total of six sources, all related to Agri-Systems role as major contractor on the project.  Plaintiff specifically alleges the bankruptcy estate suffered damages as a result of:

1.  Costs that have been incurred and which will be incurred in the completion of the project including all remedial work in order to have the project meet all plans, specifications reasonable industry standards, building codes and OSHA requirements in an amount presently believed to exceed $600,000.

2.  Loss of use of the facility and other economic harm and damages from in or about February of 2002 until the facility ultimately becomes completely operational.  These damages are expected to exceed the sum of $2,000,000.

3.  For costs incurred *and paid* by Coast for work that should have been performed by Agri-Systems but for which Agri-Systems failed and refused to perform including, but not limited to, a fire safing system which was required in order to obtain occupancy permits, and the installation of components necessary to complete the electrical system.

4.  Failure of Agri-Systems to pay insurance deductible expenses that were incurred in connection with fire and elevator accidents, both of which are allegedly caused by and the responsibility of Agri-Systems.

5.  Overbilling and duplicate invoicing by Agri-Systems.

6.  Plaintiff's Attorney's fees and expert witness fees.

Defendant's instant motion for partial summary judgment challenges Plaintiffs ability to recover damages that are speculative in nature or that were not actually paid by Plaintiff prior to the sale of the project in June, 2003.  Those damages are reflected primarily in items 1, and 2, above.  Specifically, Agri-Systems contends that Plaintiff cannot, as a matter of law

11

recover under a theory of negligence for any economic or speculative damages. Agri-Systems also contends that plaintiff cannot recover under contract theory for damages suffered under numbers 1, and 2, above, for any moneys not actually expended by Plaintiff to correct alleged construction defects prior to the sale of the project in June , 2003. Agri-Systems also contends Plaintiff may not recover for any alleged diminution of value resulting from construction defects because Plaintiff has not and cannot demonstrate the sale price was impaired as a result of construction defects. Agri-Systems also contends that it cannot be sued under the terms of the 2000 contract because that contract was canceled, and contends that it cannot be sued under the 2001 contract because Coast, and subsequently Plaintiff, failed to perform under that contract.

Plaintiff contends Agri-Systems remains liable for Plaintiff's damages notwithstanding the sale of the project as is, and without recourse. Plaintiff also contends it is entitled to the full benefit of Coast's bargain with Agri-Systems and that the valuation should be based on the value of the completed and non-defective project, not on any diminution in value at the time of sale. Plaintiff also contends its claims are preserved under both the 2000 and 2001 contracts.

**I. Contractual Privity Between Plaintiff, the Bankruptcy Estate, and Agri-Systems**

Agri-Systems memorandum of law on its motion for summary adjudication asserts, but does not develop, the contention that Agri-systems is not in contractual privity with either Plaintiff or the Coast bankruptcy estate. As a consequence of the alleged lack of privity, Agri-Systems contends Plaintiff has no remedies against Agri-Systems under contract theory and that the only claims Plaintiff may assert are claims based on tort law.

The legal status of a bankruptcy trustee with respect to creditors of the estate is defined by federal bankruptcy law, not state law. See American States Ins. Co. v. Symes of Silverdale, Inc., 150 Wash.2d 462, 467 (2003) (state court lacks power to make or enforce any law that conflicts with federal bankruptcy law).

> A bankruptcy trustee is the representative of the bankrupt estate, and has the capacity to sue and be sued. [Citation.] Among the trustee's duties is the obligation to "collect and reduce to money the property of the estate." [Citation.] The "property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case," [citation,] including the debtor's "causes of action." [Citation.] Thus, "[u]nder the Bankruptcy Code the trustee stands in the shoes of the bankrupt corporation and has standing to bring any suit that the bankrupt corporation could have instituted had it not petitioned for bankruptcy." [Citation.]

Smith v. Arthur Anderson LLP, 421 F.3d 989, 1002 (9th Cir. 2005) (internal citations omitted).

The right of the trustee to stand in the shoes of the debtor for the purpose of prosecuting the debtor's causes of action is thus well established. Agri-Systems has failed to cite any authority for the proposition that Plaintiff, as trustee of the bankruptcy estate, is obliged to affirmatively assume rights that might have accrued to the debtor under contract in order to assert causes of action that belong to the debtor. In its Summary of the Argument, Agri-Systems made the bare assertion that privity between it and the bankruptcy is lacking and that remedy is therefore unavailable to Plaintiff under contract theory. Established law indicates the contrary is true. Because Agri-Systems has chosen to not develop this argument any further or cite relevant authority in support of any exception to the well established general rule, the court rejects Agri-Systems contention regarding privity without further discussion.

## II. Limitations to Plaintiff's Claims in Light of Aas v. Superior Court, 24 Cal.4th 627 (2000).

Agri-Systems cites Aas v. Superior Court, 24 Cal.4th 627 (2000) ("Aas") for the proposition that Plaintiff may not allege, or even present evidence of, any damages that are speculative or purely economic in nature. That is, Agri-Systems contends Aas precludes any claims by Plaintiff for costs to repair defects that were not actually expended, or alleged diminution in value of the project as a result of construction defects. Plaintiff contends that the California Supreme Court's holding in Aas is applicable only to prevent negligence

13

claims that fail to allege injury to persons or property that arise out of negligent construction defects. Plaintiff's interpretation of the holding in Aas is correct.

The issue presented in Aas came to the Supreme Court as a result of consolidated writ proceedings in the superior court that challenged the court's ruling on certain motions in limine. Aas, 24 Cal. 4th at 633. In the superior court cases, two plaintiffs sued the same construction company for a comprehensive list of construction defects. Both plaintiffs alleged causes of action for negligence, strict liability and breach of implied warranty. Only in the case where Aas was the plaintiff were causes of action alleged for breach of express warranty. Id. Prior to trial, the defendant construction company moved in limine to exclude evidence of those alleged construction defects that had not yet caused property damage. The trial court granted defendant's motions to exclude evidence *only as to plaintiffs' tort claims*. Id. at 633-634. The plaintiffs sought review of the trial court's order excluding evidence prior to trial by way of writ of mandate. The court of appeals denied the writ and the Supreme Court's decision in Aas represents the review of the court of appeals' decision denying the writ. Thus, the only issue before the Supreme Court in Aas was the whether the trial court erred by excluding evidence of construction defects that had not caused actual damages for the purposes of the plaintiffs' *tort claims* only.

The Court in Aas observed that "the difference between price paid and value received, and deviations from standards of quality that have not resulted in property damage or personal injury, are primarily the domain of contract and warranty law or the law of fraud, rather than of negligence." Id at 636. The Aas Court noted the primary obstacle to plaintiffs' tort claims was the "so-called economic loss rule" which the court set forth as follows:

> In actions for *negligence*, a manufacturer's liability is limited to damages for physical injuries; no recovery is allowed for economic loss alone.

Id. (citing Seely v. White Motor Co., 63 Cal.2d 9, 18 (1965) (italics added).

The limitation of the holding in Aas to actions in tort was reiterated by the California Supreme Court in Rosen v. State Farm Gen. Ins. Co., 30 Cal.4th 1070, 1079 (2003), where

14

the Court observed, "[w]e explained [in Aas] that under the economic loss rule, 'appreciable, nonspeculative, present injury is an essential element of a tort cause of action.'" Id. (quoting Aas 24 Cal.4th at 646. Other California appellate courts have recognized the economic loss rule prevents recovery in tort for such damages but the rule does not bar recovery for the same damages under breach of warranty theory. See, e.g., Hicks v. Kauffman & Broad Home Corp., 89 Cal.App.4th 908, 918 (2nd Dist. 2001) ("the cost of repairing latent construction defects can be recovered under a breach of warranty theory without proof the defects have resulted in property damage.").

Based on the foregoing, the court rejects Agri-Systems contention that the California Supreme Court's holding in Aas prevents Plaintiff from alleging or presenting evidence of damage arising from latent construction defects. What the holding in Aas does prevent is any claim by Plaintiff for purely economic damages based on a theory of negligence. To the extent Plaintiff has alleged claims that Defendant's *negligence* caused economic damage or diminution of value of the Project, those claims are prevented. The same claims alleged on a theory of breach are not prevented.

## III. Warrantee Claims Under 2000, and 2001 Contracts

The 2000 Contract provides certain warranty protections to Plaintiff.

Article 3, subdivision 3.4 warrants that "Contractor shall comply with all Federal State and local laws, codes (including building codes), rules, regulations and orders (collectively, "Laws") applicable to Contractor in connection with the Work and the Work when completed will comply with all Laws applicable to the Work." The general warranty is set forth at subdivision 3.5 as follows:

> Subject to the limitations specified herein and in other provisions of the Contract Documents, including without limitation, limitations with respect to warranties on equipment and materials, leakage and capacities, Contractor warrants that the work will be of food quality and free from defects in workmanship and will conform to the requirements of the Contract Documents. The terms of this Contract or mutually agreed written addenda shall take precedence over drawings.

15

Subdivision 7.1 provides that "[a]ny equipment, components, products or supplies provided by [Agri-Systems] as part of the [2000] Contract will be warranted in respect to defective material as outlined in [Agri-System's] Standard Warranty Policy AS36099 [. . .] which is incorporated herein by this reference."  With respect to concrete work on the Project, subdivision 7.3 provides:

> Contractor will form and pour concrete in a workmanlike manner, free of structural defects.  As to foundations, pits, tunnels, basements, walls, floors, driveways or slabs, [Agri-Systems] specifically disclaims any warranties that concrete shall be watertight, leakproof, or free of cracks that do not affect the structural integrity of the project, and free of cracks greater that 1/4" in width.

Article 15 of the 2000 Contract provided a process for dispute resolution for disputes other than for non-payment.  This section provided that any dispute arising out of, or related to, Agri-Systems performance "shall be subject to the dispute resolution procedures set forth in this Article prior to the initiation of legal proceeding other than legal proceedings for injunctive relief."  Article 15 provides that prior to the institution of any legal proceeding, the parties must attempt to resolve the dispute first by "executive negotiation" and, if that fails to produce resolution, by mediation.  See generally Article 15 of the 2000 Contract, Exhibit C of Doak Declaration, Doc. # 269-2.

So far as the court can discern, the 2001 Contract provided no express warrantees pertaining to Agri-Systems' work.  The 2001 Contract expressly canceled the 2000 Contract as provided by Article 2, Integration; Modification, as follows:

> 2.1 Upon execution by both parties hereto, this [2001] Contract shall form the entire agreement between the parties and supersede all negotiations, discussions, prior drafts of agreement or bids, whether written or oral.  The [2001] Contract may be modified only by modification as described herein.

> 2.2 Be it also known that the certain contract between Agri-Systems and Coast Grain Company dated 3-31-2000 has been cancelled and is no longer valid or in force except that any unpaid amounts are still due and payable with interest accruing on any unpaid balances at 12% per annum until paid.  The scope of work has been modified to include everything required for Project completion.

For purposes of the instant motion for summary adjudication, Defendant's

contentions with regard to liability (as opposed to measure of damages) appear to be focused on alleged construction defects that may have occurred pursuant to the 2000 Contract. Plaintiff has not pointed specifically to any provision of the 2001 Contract that it contends constitutes an express warranty, nor has Plaintiff made any argument with regard to implied warranty. Therefore, as Defendant contends, if liability on a theory of breach of *express warranty* is to be found at all, it must be based on the provisions of the 2000 Contract. The court makes no determination as to whether Agri-Systems may be held liable for construction defects that may have occurred pursuant to the 2001 Contract under theories of either express or implied warranty.

Defendant makes two contentions with respect to its obligations under the warranty provisions of the 2000 Contract. First, Defendant contends Plaintiff was obliged to notify Defendant timely as to any construction defects and to employ the mechanisms set forth in the 2000 Contract for dispute resolution to the extent there arose any dispute as to the alleged defects. Defendant also contends that, if the alleged defects actually existed, they were patent and Plaintiff's failure to bring the alleged defects to Agri-Systems' attention waived any right to remedy. Plaintiff vigorously denies that the construction defects were patent or known prior to the cancellation of the 2000 contract.

Second, Defendant contends that cancellation of the 2000 Contract by the terms of the 2001 Contract constitutes a release of liability as to Defendant for any claims that could have been raised prior to the execution of the 2001 Contract, but were not. On the other hand, Plaintiff contends that cancellation of a contract discharges all executory obligations, but preserves all obligations that have accrued prior to the cancellation of the contract. Thus, Plaintiff contends Defendant remains liable for any work performed by it prior to the execution of the 2001 Contract.

### A.  Cancellation by 2001 Contract

"The words 'terminate,' 'revoke' and 'cancel' [. . .] all have the same meaning,

17

Case 1:02-cv-06482-AWI-LJO   Document 355   Filed 05/16/06   Page 18 of 29

namely, the abrogation of so much of the contract as might remain executory at the time

notice is given, and must sharply distinguished from the word 'rescind,' [. . .] conveys a

retroactive effect, meaning to restore the parties to their former position." Grant v.

Aerodraulics Co., 91 Cal.App.2d 68, 73 (2nd Dist. 1949).  Under contract theory, the primary

right that is violated by a construction defect is the right to take the product free of defect.

See Hicks, 89 Cal.App.4th at 922 (in breach of contract case "defect did not *cause* the injury,

the defect *was* the injury.").  It is elementary that in a case alleging breach or negligence "the

right to sue arises immediately on that breach of promise or neglect of duty." Wilcox v.

Executors of Kemp Plummer, 29 U.S. 172, 177 (1830).  Plaintiff's right to sue on the

construction omissions or defects that occurred under the 2000 Contract therefore arose at the

time of the defect or omission, which is to say, during the time the 2000 Contract was in

force.  Thus, the court concludes any construction defect that occurred during the building

that occurred under the 2000 Contract created a right (cause of action) that survived the

cancellation of the 2000 Contract by the 2001 Contract, (except as the 2001 contract may

otherwise specifically provide) because the right to sue on the construction defects or

omissions was not executory at the time of the cancellation.

Plaintiff contends it was relieved of any obligation to use the dispute resolution

process set forth in the 2000 Contract after that contract was cancelled by the 2001 Contract.

Plaintiff is correct in this contention.  The conflict resolution process contained in the 2000

Contract remained executory with respect to any conflict that was not noticed prior to the

cancellation of the 2000 Contract.  As a consequence, the right of either party to avail

themselves of the dispute resolution procedure set forth in the 2000 Contract was abrogated

when that contract was cancelled. Grant, 91 Cal.App.2d at 73.  Plaintiff cannot be held to be

obligated to employ a dispute resolution procedure after the right to compel the use of that

procedure has been abrogated by the cancellation of the contract.

While Plaintiff's right to sue on the alleged construction defects survived the

18

cancellation of the 2000 Contract because those rights were not executory at the time of the cancellation, it remains to be determined whether Plaintiff waived or forfeited the right to assert breach of warranty claims by failing to properly notice known construction defects prior to the cancellation of the 2000 contract.  This is an issue that will be addressed below.

### B.  Release by Operation of 2001 Contract

Agri-Systems contends that a party to a contract is free to release another party from liability arising under the contract, and that the parties in this case did execute such a release by the terms of Article 2 of the 2001 Contract.  The court disagrees.

California Civil Code, section 1541 provides: "an obligation is extinguished by a release therefrom given to the debtor to the creditor, upon a new consideration, or in writing, with or without consideration."  "In general, a written release extinguishes any obligation covered by release's terms, provided it has not been obtained by fraud, deception, misrepresentation, duress, or undue influence." Skrbina v. Fleming Companies, Inc., 45 Cal.App.4th 1353, 1366 (3rd Dist. 1996).  The portion of the 2001 Contract that cancels the 2000 Contract, and to which Agr-Systems refers, is quoted above.  The court has read this section carefully and finds no release.  As previously discussed, the cancellation of a contract does not, by itself, act as a release because it does not reach back in time to negate rights or obligations that arose during the operation of the contract, prior to its cancellation.  A release is in the nature if a rescission, not a cancellation.  See Larsen v. Johannes, 7 Cal.App.3d 491, 501 (1st Dist. 1970) (transaction rescinding and terminating contract interposes at the outset a bar to suit for breach of rescinded contract).

The court cannot alter the terms agreed to by the parties in the 2001 Contract, or supply a provision for rescission and release where there is absolutely no evidence of mutual intent to do so.

### C.  Waiver of Rights Under 2000 Contract

Defendant contends the failure of Coast or Plaintiff to timely notice any alleged

19

construction defects and submit any disputes arising therefrom to the process set forth in the 2000 Contract waives any right to recover damages for the alleged construction defects.  In this regard, Defendant alleges that any of the defects that give rise to claims for damages in the complaint were patent.  Defendant alleges the construction defects complained of by Plaintiff were either known to Coast's Project foreman or should have been determined timely by inspection.

The parties strenuously dispute whether the alleged construction defects were patent or latent.  The threshold issue, however, is whether the failure to submit any notice of alleged construction defects, whether the defects were patent or latent, to the dispute resolution procedure set forth in the 2000 Contract constitutes a waiver of the right to allege those defects in a subsequent action.  The court concludes there was no waiver.

"Case law is clear that ' "[w]aiver is the intentional relinquishment of a known right after knowledge of the facts." [Citations.]' 'The burden ... is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and 'doubtful cases will be decided against a waiver' [citation]." Waller v. Truck Ins. Exchange, Inc., 11 Cal.4th 1, 31 (1995) ("Waller").

Defendant cites Renown, Inc. v. Hensel Phelps Constr., 154 Cal.App.3d 413 (1 Dist. 1984) ("Renown") for the proposition that the failure of a party alleging construction defects to submit those defects to a contractually specified dispute management process waives the right to allege those deficits later in a court action.  Renown does not support the contention for which Defendant cites the case.

In Renown, a winery appealed the decision of the superior court denying a motion to compel a construction contractor and an architectural and engineering firm to submit to arbitration on a winery's claims of construction defects.  Renown, 154 Cal.App.4th at 416-417.  The arbitration agreement the appellant sought to enforce contained two relevant limitations.  First, the arbitration agreement "expressly prohibited a demand for arbitration

20

being made after the date when institution of legal proceedings on any underlying claim would be barred by the applicable statute of limitations."  Second, the construction agreement provided that the making or acceptance of final payment waived any claims that arose under the construction agreement and those claims that were so waived were excepted from arbitration.  Id. at 416.  The trial court in Renoun denied enforcement of the arbitration agreement because it found that any claims were waived as to the contractor because the winery made, and the contractor accepted final payment.  The trial court denied the motion to compel arbitration as to both the contractor and the architectural firm because the winery failed to demand arbitration before the applicable statute of limitations had run on the underlying claims.  Id. at 417.

The Renown court upheld the decision of the trial court on essentially the same grounds; that is, the court held substantial evidence existed to support the trial court's finding the statute of limitations had run on the alleged construction defects and substantial evidence existed to support the trial court's finding that final payment had been offered and accepted. Id. at 419, 421.  When the decisions in Waller and Renown are considered together, two generalizations flow that undercut Defendant's contention that Plaintiff's construction defect claims are waived.  First, if a waiver of a right to assert a claim arises out of a contractual agreement to participate in alternative dispute resolution, the waiver must be express and the terms of the express waiver delineate the scope of the waiver.  Thus, the general rule in Waller that defines a waiver as knowing and voluntary is exemplified by the factual situation in Renown where the waiver is enforced strictly according to the terms of the agreement that gave rise to the waiver.

Second, and perhaps more important, the decision in Renown illustrates that the right conferred by an arbitration or other contractual dispute resolution agreement is the right to compel arbitration in the event a dispute arises under the contract.  Had Plaintiff's construction defect claims been alleged while the 2000 Contract was in effect, Defendant's

remedy would have been the same as the remedy sought in <u>Renown</u>.  That is, Defendant could have compelled Plaintiff to submit his claims for construction defect to whatever procedures the 2000 Contract specified while Plaintiff's court action was stayed.  Cal. Code Civ. Proc. § 1281.4; <u>Lewsadder v. Mitchem, Jones & Templeton, Inc.</u>, 36 Cal.App.3d 255, 261 (2nd Dist. 1973) (proceeding arising under contract containing arbitration agreement is stayed pending outcome of arbitration).  As discussed above, the dispute resolution provisions of the 2000 Contract were executory at the time the 2001 contract was executed.  Thus, Defendant's right to compel Plaintiff to use the process set forth in the 2000 Contract was abrogated with the cancellation of the 2000 Contract by the terms of the 2001 Contract.  <u>Grant</u>, 91 Cal.App.2d at 73.  Defendant has presented no authority to support its contention that the failure of Coast or Plaintiff to allege construction defect claims under the terms of the cancelled 2000 Contract waived Plaintiff's right to allege those claims in this court.

Arguably, what Defendant is actually contending in its argument that Plaintiff may not now sue for construction defects because the time during which those claims could have been raised is passed is that Plaintiff has *forfeited* any claims against Agri-Systems.  "'The terms "waiver" and "forfeiture" long have been used interchangeably. As the United States Supreme Court has explained, however, [w]aiver is different from forfeiture.  Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the "'intentional relinquishment or abandonment of a known right." [Citations.]' [Citation.]" <u>Osman v. Superior Court</u>, 134 Cal.App.4th 32, 36 n.1 (2nd Dist. 2006).  The analysis of forfeiture is, however, similar and the conclusion the court reaches remains the same.

As with the issue of waiver, the burden of proof of forfeiture is on the party asserting the forfeiture.  <u>Chase v. Blue Cross of California</u>, 42 Cal.App.4th 1142, 1157 (1st Dist. 1996).  Logically, a party's failure to timely assert a right granted by a contract only forfeits that right or such other rights as the contract may expressly state are forfeited.  Absent some other express provision in the 2000 Contract, the only right that could be forfeited by

22

Plaintiff's failure to use the dispute resolution procedure set forth in the 2000 Contract is the right that is conferred by that procedure; that is, the right to compel the opposing party to use the dispute resolution procedure set forth in the 2000 Contract. The <u>Renown</u> decision does not indicate otherwise. To the extent there was any forfeiture in <u>Renown</u>, that forfeiture came about because the plaintiff had failed to bring the complaint before the relevant statute of limitations had run. Thus, in <u>Renown</u> the right that was forfeited was the right to bring a cause of action, and that right was forfeited by operation of statute, not by the terms of the contract.

Here, there is no allegation of any statutory right that Plaintiff has forfeited. There is also no basis within the terms of the 2000 Contract for finding there was a forfeiture of any right under that contract except perhaps the right to compel the opposing party to engage in alternative dispute resolution. There is no basis for Defendant's contention that Plaintiff has either waived or forfeited the right to bring its claim in this court.

Since the court finds there was no waiver or forfeiture of Plaintiff's right to sue on its claims of construction defect, the parties' disputations as to whether the alleged construction defects were patent or latent are irrelevant. Conceivably, the question of whether the alleged construction defects were patent or latent could be relevant to the issue of Plaintiff's duty to mitigate damages and therefore relevant to Defendant's defense. That issue is not, however, currently before the court and the court makes no determination as whether the alleged construction defects were patent or latent.

**IV. Plaintiff's Measure of Damages**

Defendant's final argument bears the heading "Plaintiff Cannot Assert His Rights and Ignore All His Obligations Under the [2001] Contract." The pleading is confusing but in sum Agri-Systems appears to present three arguments. First, Agri-Systems contends Plaintiff or the Coast estate cannot enforce the terms of the 2001 Contract while at the same time ignoring Coast Estate's obligations under the same contract. Second, Defendant contends

23

that, to the extent Plaintiff is entitled to any damages for delay of the project, those damages are confined to amount of liquidated damages specified by the 2001 Contract.  Third, Defendant contends Plaintiff's damage claims are confined to the costs Coast or the Coast estate actually incurred in completing work that should have been done by Agri-Systems or actually incurred in repairing construction defects that were the responsibility of Agri-Systems.

Plaintiff does not address Defendant's first allegation that Plaintiff or the Coast estate cannot recover under the terms of the 2001 Contract where Plaintiff has ignored its obligation that arise under the same contract.  On the other hand, Defendant's argument on this point is confined to the point that $2 million is the amount Agri-Systems was due under the 2001 Contract and that Plaintiff's claims for damages arising against Agri-Systems, if proven, may only be applied as an offset against the amount the Coast estate owes Agri-Systems under the 2001 Contract.  As far as the court can discern, Defendant's basic contention is actually an extension or example of their main argument – that Plaintiff cannot claim damages that exceed what Coast or the Coast estate actually spent to complete the tasks Agri-Systems should have completed or correct Agri-Systems' mistakes.  To the extent this is what Agri-Systems is actually arguing, that argument will be addressed below.  To the extent Defendant is making a different contention that is not addressed by the analysis that follows, Defendant's motion for partial summary adjudication will be denied without prejudice.

In a similar vein, Plaintiff appears not to address Defendant's contention concerning limitations on damages recoverable for delay of the project.  Defendant, for its part, does not develop its argument beyond the assertion that the 2001 Contract provides a specified sum that constitutes liquidated damages for any delay of completion that is attributable to Agri-Systems.  Obviously, the applicability of the liquidated damages provision depends on when, if ever, the 2001 Contract was breached, and by whom.  This issue is hotly disputed by the parties.  A review of the disputed and undisputed material facts submitted by the parties and

24

the legal arguments asserted leads the court to conclude the issue of breach remains disputed. Therefore, to the extent Defendant's motion for partial summary judgment requires a determination of the existence of breach or the breaching party, that motion will be denied.

Defendant's third and major contention is that Plaintiff is not entitled to the measure of damages Plaintiff claims. That is, Defendant contends Plaintiff may only claim as damages expenses it actually incurred in the repair of construction defects or the completion of work that was Argi-Systems responsibility but not completed by them. Plaintiff contends it is entitled to damages equal to the amount it would have to have expended, but did not expend, in order to realize the benefit of its bargain to a Project free of construction defects.

Plaintiff cites Raven's Cove Townhomes, Inc. v. Knuppe Development, 114 Cal.App.3d 783, 802 (1 Dist. 1981) for the proposition that the proper measurement of Plaintiff's damages is the cost of repair or replacement of deficient or missing work. In Raven's Cove, the court found development company liable to a homeowner's association for defects in landscaping of a residential project. Id. at 788-790. The homeowner's association was without the ability to collect the cost of repair of the defect within a short period of time and could not borrow the funds to do make the repairs. Id. at 788. The Raven's Cove court recognized that while "the normal measure of damages for injuries to real property is the difference between the market value of the land before and after the injury, '[a]nother permissible measure is the reasonable cost of repair or restoration of the property to its original condition, together with the value of the lost use during the period of injury.' [Citation.]" Id. at 802 (quoting 4 Witkin, Summary of Cal.Law (8th ed. 1974) Torts § 842, p.3137).

Other California cases further inform the court's discretion in structuring the measurement of damages. In Heninger v. Dunn, 101 Cal.App.3d 858 (1st Dist. 1980), the court considered the measure of damages where the defendant had committed trespass by bulldozing a road through a portion of the plaintiff's property. The court found the trespass

actually increased the market value of the property and that the cost to restore the property to its original condition would be close to $250,000.  Id. at 861.  The court recognized the normal damage award in cases of tortious injury to property is the lesser of the diminution of market value of the property or cost to restore.  Id. at 862.  Nevertheless, the Heninger court held that under the facts of that case, "[r]estoration costs may be awarded even though they exceed the decrease in market value if 'there is a reason personal to the owner for restoring the original condition.' [Citation.]"  Id. at 863.  In Orndorff v. Christiana Cmty. Builders, 217 Cal.App.3d 683, 687 (4th Dist. 1990), the appellate court applied the so-called "personal reason" exception adopted in Heninger to the context of damages for construction defects that had been awarded under theories of breach of warranty, strict liability and negligence.  In affirming the trial court's award of costs of repair and/or reconstruction, the court noted that under established California case law, "'[r]estoration costs may be awarded even though they exceed the decrease in market value if "there is a reason personal to the owner for restoring the original condition" [citation,] or "where there is a reason to believe that the plaintiff will, in fact, make the repairs." [Citation.]' [Citations.]"  Id. at 687.

The limitations of the "personal reason" exception were explored in Housley v. City of Poway, 20 Cal.App.4th 801 (4th Dist. 1993).  In Housley, the appellate court reviewed the defendant's contention that jury instructions that permitted an award of restoration costs in an inverse condemnation case were improper.  The Housley court held that in the context of inverse condemnation, courts traditionally award as damages the value of the land condemned.  The court cautioned that under circumstances were the land was transferred to the state's use without the destruction of any improvements on the land, to compensate for restoration would would constitute double recovery because the government would be paying first for the use of the land and paying again for the cost to the owner to recapture the same land.  Id. at 809.  The court further observed that costs of repair or recovery, where they are requested, must be "not unreasonable in relation to the value of the land and the damage

1    inflicted." Id. at 810 (citing Heninger, 101 Cal.App.3d at 865-866).

2           Each of the cases discussed above recognize that the general rule for measure of

3    damages under tort or contract causes of action pertaining to real property is the lesser of the

4    decrease in value of the property as result of the tort or breach, or the cost to restore,

5    whichever is less.  Under each of these cases, the cost to repair, where that cost is greater than

6    the loss in value of the property, is an exceptional measure of the award of damages that must

7    be justified by the particular facts of the case.  Prominent among the requirements in each of

8    these cases is the requirement that the owner have a personal reason for desiring the repair or

9    restoration.  The court notes that the decision in Raven's Cove does not constitute an

10   expansion of this "personal reason" exception.  As illustrated in Orndorff, the "personal

11   reason" exception is simply typical of the type of case in which it can be fairly said that the

12   owner will, in fact, make the repairs to restore the property.  Orndorff, 217 Cal.App.3d at

13   687.  "Personal reason" is therefore simply a shorthand to indicate the high probability that

14   the plaintiff, if awarded the costs of repair or restoration, will actually undertake those

15   expenses.  Raven's Cove illustrates this situation because the plaintiff was a homeowner's

16   association that, because of its necessary association with the property, could be presumed to

17   fulfill its duty to the homeowners to undertake the repairs on their behalf.

18          In cases where the costs of repair exceed the diminution in value of the property,

19   restricting the use of costs of repair as measurement of damages to those cases where the

20   plaintiff has a personal reason to desire the repairs helps assure that double recovery is not

21   awarded to the successful plaintiff.  See Housley, 20 Cal.App.4th at 809 (citing cases

22   rejecting award of costs of repair where such award would be duplicative).  In the instant case

23   Plaintiff's sale of the project as is, and without recourse, establishes conclusively that

24   Plaintiff has no conceivable personal reason to desire compensation for the cost of repair.

25   That is, the sale of the Project establishes conclusively that Plaintiff will not spend an award

26   for cost of repair on repairs.

27

28                                                    27

This is the main reason an award of cost to repair Agri-Systems' alleged construction defects would constitute an impermissible measure of damages in this case. Plaintiff has been paid once for the value of the property. The magnitude of the costs of repair damages Plaintiff alleges is nearly equal to the cost of the Project itself. Thus, what Plaintiff is seeking by way of costs of repair is to be paid once for the Project by the purchaser and to be paid again to build the Project without defects by Defendant. This is the very definition of double recovery. Pursuant to the foregoing, it is clear Plaintiff may not recover damages equal to the costs of repair of alleged construction defects where those repair costs were not actually incurred.

The court finds the proper measure of Plaintiff's damages is the diminution in value at the time of sale of the Project that resulted from Agri-Systems construction defects, if any. Plaintiff may also recover monies actually spent prior to the sale to repair Agri-Systems construction defects or expenses actually incurred by Plaintiff to repair damage to the project that resulted from those defects.

THEREFORE, it is hereby ORDERED that:

1.    Defendant's motion for partial summary judgment on the issue of whether Plaintiff may sue under contract theory for damages arising under either the 2000 or 2001 Contracts is DENIED.

2.    Defendant's motion for partial summary judgment on the issue of whether Plaintiff may present evidence of, and seek recovery for, economic damages or diminution in value of the Project because of construction defects occurring under either the 2000 or 2001 Contracts is DENIED.

3.    Defendant's motion for partial summary adjudication on the issue of whether Plaintiff may recover for costs of repair of construction defects is GRANTED. Plaintiff may

not recover for, or present evidence of, costs of repair of construction defects where

such repairs were not actually made and such costs were not actually incurred.

IT IS SO ORDERED.

**Dated:   May 15, 2006**                              **/s/ Anthony W. Ishii**
0m8i78                                        UNITED STATES DISTRICT JUDGE